# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION,

           Plaintiff

  v.

NHS SYSTEMS, INC.,

    a Pennsylvania corporation, also d/b/a
    National Healthcare Solutions and
    National Health Net Online, and

HARRY F. BELL, JR.,

    individually and as an officer or
    principal of NHS Systems, Inc., and

PHYSICIAN HEALTH SERVICE, LLC,

    a Missouri limited liability company,
    also d/b/a/ American Health Benefits
    On Line, and

DONNA NEWMAN,

    individually and as an officer or
    principal of Physician Health Service,
    LLC, and

JOHN E. BARTHOLOMEW,

    individually, and

PLUS HEALTH SAVINGS, INC.,

    a Pennsylvania corporation

PHYSICIANS HEALTH SYSTEMS,
    INC., a Delaware corporation, also d/b/a
    American Health Benefits On Line

CIVIL ACTION

No. 08-2215

HEALTH MANAGEMENT, LLC,
    a Missouri limited liability company

6676529 CANADA, INC.,
    a Canadian corporation

NICOLE BERTRAND,
    individually and as an officer or
    principal of 6676529 Canada, Inc.

BARRY KIRSTEIN,
    individually

"DANNIE BOIE"
    a person whose true identity is
    unknown, individually

PHS ENTERPRISES, INC.,
    a Nevada corporation

FIRST STEP MANAGEMENT, INC.,
    a St. Lucia company

GOLD DOT, INC.,
    a St. Lucia company

LINKE JN PAUL,
    individually and as an officer or
    principal of First Step Management, Inc.
    and Gold Dot, Inc.

TASHA JN PAUL,
    individually and as an officer or
    principal of Gold Dot, Inc.

NEVADA BUSINESS SOLUTIONS,
INC.,
    a Nevada corporation

INTERFACE MANAGEMENT, INC.,

a Florida corporation, also d/b/a Galaxy
Member Benefits

BEGINNING AGAIN, INC.,
    a Florida corporation

                    Defendants

Pollak, J.                                              September 24, 2009

## OPINION

In this litigation, whose underpinnings I will not discuss at great length, the

Federal Trade Commission ("FTC") has alleged that a vast telemarketing scheme was

perpetrated by the named defendants.  I have already ordered preliminary injunctive relief

in favor of the FTC and appointed a receiver over the corporate defendants (the

"Receivership Entities") in order to recoup funds on behalf of consumers who were, it

appears, defrauded.

As part of his duties, the Receiver, Wayne D. Geiser, has sought funds from

Teledraft – a payment processing company that processed funds on behalf of some of the

Receivership Entities, but that has not itself been named as a defendant in this matter –

that the Receiver alleges are property of the Receivership.  When Teledraft refused to turn

over the funds sought by the Receiver, the FTC moved this court to compel Teledraft to

turn over those funds.  After extensive briefing by both Teledraft and the FTC, this court

held a hearing on July 23, 2009, at which both parties were permitted to present evidence.

1

Subsequent to the hearing, both parties submitted additional declarations.

Having considered the parties' filings, together with the evidence and arguments adduced at the hearing, I will, for the following reasons, grant the FTC's motion..

## I.  FACTUAL FINDINGS AND PROCEDURAL HISTORY

A.

The defendants in the underlying litigation (of which the instant FTC motion is a sub-part) sold health benefit plans by employing telemarketers;  those telemarketers' mission was to obtain bank account information from consumers.[1]  Teledraft processed payments for the providers of these health plans.  Specifically, when a telemarketer obtained the bank account information of a consumer, the telemarketer provided that information, along with the amount to be charged, to Teledraft.  Teledraft would then use that bank account information to process a payment from the consumer's bank account into the provider's bank account.  In simple terms, Teledraft was a middleman between the customer and the health care providers.

Teledraft used two different methods of payment processing: remote checks (a.k.a. "Check 21" transactions or "demand drafts") and Automated Clearing House ("ACH")

_____

[1] According to the FTC, the health plans were phony.  Moreover, the fraud alleged by the FTC involved various forms of unauthorized withdrawals of funds from consumers' accounts. The FTC represents that some of the consumers never consented to payment, while others consented to payment different from (and less than) the costs they were charged, and still others thought their bank account information would be used solely in order for deposits to be made in those accounts.

transfers.  Teledraft processed remotely created checks for defendant NHS Systems, Inc.

("NHS"), beginning in February 2008, and for Physicians Health Systems, Inc. ("PHS-3")

and defendant Physicians Health Service, LLC ("PHS-4") shortly thereafter.  Teledraft

ceased processing remote checks on May 2, 2008, and paid out in full the balances it

owed to NHS, PHS-3, and PHS-4 (collectively, the "NHS/PHS Entities"), respectively.

On May 12, 2008, Teledraft began processing ACH transfers for the NHS/PHS

Entities, ceasing to do so on May 15, 2008.[2]

Remote checks and ACH transfers are financial instruments both of which

facilitate essentially the same transaction: the transfer of funds from one bank account

into another.  Teledraft's bank, upon receiving from Teledraft either a remotely created

check or ACH transfer, would simultaneously request payment from the consumer's bank

and provisionally credit the amount of that remote check/ACH transfer to Teledraft's

bank account.[3]  If the request was granted, the consumer's bank would debit the

consumer's account and transfer the money to Teledraft's bank; Teledraft's bank would

then simply leave Teledraft's account credited (i.e. unchanged).  If the payment was

"returned" – i.e., if the bank refused to pay (because, e.g., the charge was not authorized

by the consumer) – Teledraft's bank would deduct the amount it had previously

---

[2] On May 15, 2008, Teledraft received notice of an *ex parte* temporary restraining order issued by this court the day before.  That restraining order is discussed *infra* in Section I.B.

[3] Teledraft did not keep separate bank accounts for each of its clients, opting to store its funds in general clearing accounts.  However, it internally kept track of each client's (including each of the Receivership Entities') monies by creating a "virtual" account for each.

provisionally credited to Teledraft's account.

The determination whether one of these provisional credits has become final (and therefore no longer subject to an automatic deduction in the event of a return) is referred to as "settlement."  When a consumer charge is returned after the settlement period (e.g. if it takes eight days for a consumer's bank to realize a charge was unauthorized, and then the consumer's bank requests a refund on behalf of the consumer), the institution of first deposit (in this case, Teledraft's bank) is responsible, as the warrantor of the transaction, for any potential refund.  The NHS/PHS Entities and Teledraft agreed on a settlement period of five days.  Therefore, the final settlement date for the last remote checks processed for the NHS/PHS Entities by Teledraft was May 9, 2008, and the final settlement date for the last ACH payments processed for the NHS/PHS Entities by Teledraft was May 21, 2008.

The only salient difference (for the purposes of this litigation) between remotely created checks and ACH transfers is that national accounting standards strictly regulate ACH transfers.  NACHA, the electronic payments association that oversees the ACH network, has established a return-rate threshold of 1% for unauthorized debit entries.[4] NACHA also requires that the ACH network not be used to process payments arising

---

[4] Members of the ACH network are not permitted to service clients whose ACH transfers were returned more than 1% of the time due to unauthorized charges.  According to the Receiver, Teledraft president Al Slaten informed the Receiver that Health Management LLC (an alter ego of NHS) had a return rate of 18%, PHS-3 had a return rate of 66%, and PHS-4 had a return rate of 55%.  *See* Geiser Declaration at ¶ 19 (Docket No. 103, filed July 31, 2009).

from outbound cold-calling telemarketing campaigns, or for recurring payments under any circumstances.[5]

The contracts governing the business relationships between the various NHS/PHS Entities and Teledraft are all materially identical.  In those contracts, the clients warrant, among other things, that they will not break any laws and that each of their telephone sales will be a legitimate transaction.  Contractual provisions also provide that Teledraft can deduct its fees prior to the settlement of any funds; deduct any debts owed by the NHS/PHS Entities from funds that Teledraft would otherwise pay out; and charge/deduct funds from the NHS/PHS Entities if those providers engage in fraud, have a charge/sale returned, charge a consumer without authorization, or fail to comply with the contract and/or with NACHA and FTC rules and regulations.  The contracts make Teledraft an independent contractor of the NHS/PHS Entities, and they do not explicitly designate Teledraft as a legal fiduciary or trustee over any funds.


B.

In the original complaint filed in this litigation, the FTC accused the following five defendants of defrauding consumers: NHS, PHS-4, NHS President Harry F. Bell, Jr., PHS-4 President Donna Newman, and John Bartholomew.  On May 14, 2008, I granted

---

[5] Nevertheless, according to the FTC, the NHS/PHS Entities were engaged in both outbound telemarketing cold calls *and* in charging customers' bank accounts in a recurring (monthly) fashion.

5

the FTC's motion for an *ex parte* Temporary Restraining Order (the "XTRO").  As part of

the XTRO, I appointed Wayne D. Geiser as the Receiver over the "Receivership

Defendant," defined in the XTRO as "NHS Systems, Inc. . . . and any of its affiliates,

subsidiaries, or divisions."  On June 10, 2008, upon entry of a Stipulated Preliminary

Injunction ("SPI"), the Receiver was appointed as to PHS-4 and PHS-3 (a non-party to

the complaint) as well.

Although Teledraft is not a party to this litigation, the XTRO and SPI apply to

Teledraft.  Section II of the XTRO, which freezes the Receivership Defendant's assets,

expressly applies to "independent contractors" of the Receivership Defendant, and its

terms (Section II.A) apply the asset freeze to, *inter alia*, money held for the Receivership

Defendant by an "ACH Network or other payment processor."  In addition to containing

terms substantially similar to the XTRO, the SPI (in Section IV.C) requires Teledraft by

name to promptly disclose the NHS/PHS Entities' account information to the Receiver.

C.

_____Teledraft's President Al Slaten wrote to the FTC on May 16, 2008, that, as of May

15, 2008, Teledraft was in possession of, and had frozen, $53,021.05 of funds for NHS,[6]

---

[6] The account was actually under the name "Health Management LLC."  Health
Management was an alter ego of NHS (i.e. NHS was doing business as Health Management, as
noted in this case's caption).

$346,803.69 for PHS-3, and $68,345.09 for PHS-4, totaling $468,169.83.[7]  It is undisputed that, by May 21, 2008, those accounts had been reduced to $222,989.53.  *See* Slaten Declaration at ¶ 23 (Docket No. 102, filed July 31, 2009).  It is also undisputed that this dissipation in funds was due to returns on both settled and unsettled transactions.

After May 21, 2008, any returns would have been due to returns on settled transactions.  According to the Receiver, had the funds that were dissipated between May 15, 2008, and May 21, 2008, only been due to returns on unsettled transactions, as opposed to other charges levied by Teledraft against the NHS/PHS Entities, the amount of Receivership funds held by Teledraft as of May 21, 2008 would have been $264,224.03.  I find, as a matter of fact, that the Receiver's calculations are reliable.

The parties dispute the chronology and substance of the communications that took place between the Receiver and Teledraft subsequent to this Court's issuance of the XTRO.  Both parties agree that, on May 19, 2009, Slaten contacted the FTC with information regarding the bank accounts at which Teledraft was sending funds to the Receivership Entities; there is nothing in the record to indicate, however, that Teledraft's production included any information about the location of the accounts in which Teledraft was holding its own funds.  It is also clear that, on May 20, 2009, the Receiver requested that Teledraft "[i]dentify . . . any and all bank accounts of what ever type."  Docket No.

---

[7]  Geiser has submitted a copy of that letter as Exhibit A to his declaration.  *See* Docket No. 103 Exh. A.

7

103, Exh. C.

The Receiver has stated that he had a conversation with Slaten on May 23, 2008, in which Slaten "identified the First State Bank (of Nebraska) as the bank that Teledraft used to process Remotely-Created Check transactions." Geiser Declaration at ¶ 14. Geiser further states that he contacted the Nebraska bank that same day and was informed that "Teledraft-related accounts at [the Nebraska] bank related only to Teledraft's Remotely-Created Check processing and that the last date that there had been any check transaction processing was May 2, 2008." *Id.* at ¶ 15.

After a series of emails and phone conversations in which he asked Teledraft to identify the location of NHS's funds, Geiser was informed, on July 8, 2008, that Teledraft used "1st State Bank of Nebraska for 'Check 21' or 'demand drafts' transactions and Upstate Bank of New York for ACH transactions." Docket No. 103 Exh. M. That same letter stated that "[o]n or about May 2, 2008, Teledraft ceased providing 'Check 21' or 'demand draft' services to all of its clients[.]" *Id.*

According to Slaten, he contacted the Receiver on May 28, 2009, with a computer file containing "information about all of the transactions processed by Teledraft for the three Receivership Entities." *See* Slaten Declaration at ¶ 13. Teledraft has produced an email to the FTC, written on that date, that notes that one of the computer tables produced "houses all of the transactions for the three companies in question," as well as an email from the FTC acknowledging receipt of those materials. *See* Docket No. 102 Exhs. C, D.

Slaten contends that the files Teledraft had produced as of May 29, 2009, "contained information about Teledraft's bank accounts at the Upstate Bank of New York and the First State Bank of Nebraska."  Slaten Declaration ¶¶ 17-19.  Thus, Slaten maintains, "even if [he] had not personally informed the FTC and Receiver about Teledraft's accounts at the Banks, they could have determined that Teledraft held accounts at the First State Bank of Nebraska merely by examining the Documents, which were provided to the FTC and Receiver as early as May 28, 2008."  *Id.* at ¶ 20.  In any event, a representative of the First State Bank of Nebraska has confirmed that it was served with a copy of the XTRO on May 15, 2008.  *See* Docket No. 102 Exh. 1.

I observe, however, that the only evidence of discrete transactions produced by Teledraft pertains to the First State Bank of Nebraska, *not* to the Upstate Bank of New York.  *See* Docket No. 102 at ¶¶ 18-19, Exhs. 5-6.  Only the Upstate Bank of New York was used for ACH transactions.  Accordingly, I find, as a matter of fact, that, based on the evidence of record, Geiser was not informed of the location of Teledraft's ACH-transacted funds – i.e., of the location and relevance of the First Upstate Bank of New York – until Geiser received the July 8, 2008 letter.  It is undisputed that, on July 18, 2008, Geiser filed a copy of the complaint and the order appointing him as Receiver in the Western District of New York, where the Upstate Bank of New York is located; he also provided a copy of the XTRO to the Upstate Bank of New York on that date.

9

## II. JURISDICTION

In this litigation, the FTC is seeking to enforce the FTC Act, 15 U.S.C. § 41 *et. seq.,* and thus this court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

The crux of the non-party Teledraft's special appearance is that the court does not have *in personam* jurisdiction over Teledraft as a party or *in rem* jurisdiction over Teledraft's funds.[8]  As a threshold matter, it is clear that the court does not have *in personam* jurisdiction over Teledraft because Teledraft was never served as a party in this litigation pursuant to the Federal Rules of Civil Procedure.  *See SEC. v. Ross*, 504 F.3d 1130 (9th Cir. 2007) (holding that even when a receiver is empowered to exercise nationwide service of process, "in order for the court to assert personal jurisdiction over a party-in-interest, the party must be properly served" in accordance with Fed. R. Civ. P. 4(k), otherwise a district court's *in personam* power over that party remains "nothing more than a potentiality").

This court does, however, have *in rem* jurisdiction over Receivership funds pursuant to 18 U.S.C. § 754.  Section 754, which sets out a receiver's nationwide jurisdiction over receivership property, provides in its entirety:

> A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof.

---

[8] Teledraft is making a special appearance to contest jurisdiction and thus has not waived its right to contest this court's jurisdiction.  *See Hazeltine Corp. v.  Kirkpatrick,* 165 F.2d 683, 685-6 n.3 (3d Cir. 1948) (citations omitted).

10

> He shall have capacity to sue in any district without ancillary appointment, and may be sued with respect thereto as provided in section 959 of this title.
>
> Such receiver shall, within ten days after the entry of his order of appointment, file copies of the complaint and such order of appointment in the district court for each district in which property is located. The failure to file such copies in any district shall divest the receiver of jurisdiction and control over all such property in that district.

Thus, according to this statutory language, Receiver Geiser has "complete jurisdiction and control" of all the defendants' property as well as the capacity to sue for that property in any district.

Teledraft contends that the Receiver has been divested of his *in rem* authority due to his failure to file the required documents (1) in the Western District of New York within ten days of the entry of his appointment, and (2) in all of the districts in which Teledraft holds funds on behalf of the defendants. The first of these objections fails because, in *SEC v. Equity Service Corp.,* 632 F.2d 1092 (3d Cir. 1980), the Third Circuit held that "a receiver who has failed to file within the ten-day period" can "reassume jurisdiction by a later filing, as long as the rights of others have not been prejudiced during the intervening period." 632 F.2d at 1095. As Teledraft has made no showing that it was prejudiced by the timing of the Receiver's filing, the Receiver's late filing does not divest this court of *in rem* jurisdiction.[9]

---

[9] *Equity Service Corp.* suggests two possible reasons for § 754's ten-day filing requirement: either (1) it "was intended to permit a receiver to choose whether or not to take responsibility for property in each district in which potential receivership property is located" in order to "ensure[]" that a receiver will not be responsible for property of which he or she has no

Whether the Receiver has failed to properly assert his authority over funds held by Teledraft outside of the Western District of New York, meanwhile, turns on the facts disputed by the parties' conflicting declarations.  I have found, as a matter of fact, that the Receivership property was not located in the First State Bank of Nebraska because that bank was used exclusively for remotely created check transfers, which do not form the basis of the Receiver's instant motion.  Teledraft itself has stated that the Upstate Bank of New York was the bank used for ACH transfers, which are the source of the funds currently sought by the Receiver.  Thus, failure to file outside the Western District of New York does not strip this court of *in rem* jurisdiction over any Receivership property.

Teledraft further contends that this court lacks jurisdiction over the funds sought by the Receiver because those funds are not property of the Receivership in the first place.  According to Teledraft, those funds do not belong to the Receivership estate because the NHS/PHS Entities merely possess a contract claim to those funds, as opposed to the funds themselves, without a final judgment affirming their right to the funds.  In support of that argument, Teledraft emphasizes that it is an independent contractor of the

knowledge," or (2) it was intended to provide notice to the public of what property is within the Receiver's jurisdiction.  632 F.2d at 1095.  Although *Equity Service Corp.* does not conclusively resolve which of these two plausible statutory purposes is correct (or even predominant), it does make clear that *if* notice were the true purpose of the statute, a party challenging a receiver's jurisdiction based on failure to comply with § 754 could not prevail without demonstrating that it "suffered harm from lack of notice."  *Id.*  There has been no harm where, as here, the Receiver filed within ten days of having learned of the location of the Receivership property.  Had Teledraft clearly explained the existence of the Upstate Bank of New York to the Receiver in a timely fashion, it is clear to this court that the Receiver would have filed the appropriate paperwork within ten days.  Accordingly, his reassertion of jurisdiction was entirely effective.

NHS/PHS Entities, as opposed to a trustee or fiduciary, and that it holds the contractual

right to withhold funds in a variety of circumstances, including in the event of fraud.

"The general rule is that a receiver acquires no greater rights in property" than the

receivership entities had previously. *Javitch v. First Union Securities, Inc.,* 315 F.3d 619,

625 (6th Cir. 2003). Teledraft's argument that the NHS/PHS Entities have no property

rights, as opposed to contract rights, to the funds at issue, however, falls flat. Although

receivers do have limited rights to property, Teledraft cites to no persuasive authority that

directly addresses a situation resembling the instant matter,[10] and it defies common sense

that funds collected by Teledraft – which is essentially nothing more than a middleman –

for the Receivership should be considered the property of Teledraft.

---

[10] The cases cited by Teledraft involve receiverships in quite different contexts. *See, e.g., United States v. Beaver*, 252 F.2d 486 (3d Cir. 1958) (considering whether the receivership should take priority over competing creditors); *Kohlrautz v. Oilmen Participation Corp.,* 441 F.3d 827 (9th Cir. 2006) (considering whether receiver of a marital receivership exceeded the authority given him by the court); *Liberte Capital Group, LLC v. Capwill,* 421 F.3d 377 (6th Cir. 2005) (considering the receiver's role in resolving competing claims to a life insurance policy). None of the cases cited by Teledraft directly addresses a situation involving a bank or other similar financial institution that holds funds on behalf of a receivership entity.

Teledraft also argues by analogy to the bankruptcy context, noting that the definition of "asset" used in the FTC's motion ("any legal or equitable interest in . . . any real or personal property") is virtually identical to the definition of estate property in 11 U.S.C. § 541 ("all legal or equitable interests of the debtor in property as of the commencement of the case"). In bankruptcy proceedings under § 541, Teledraft claims, the Receivership would have nothing more than an unsecured claim against Teledraft for monies owed under the Contracts, and therefore the only "asset" possessed by the Receivership is a contract claim, not the funds themselves. Teledraft's bankruptcy analogy, however, is inapposite because these are not bankruptcy proceedings. In contrast to a bankruptcy proceeding, the issue confronting this court is not whose competing claim to funds takes priority according to a complex statutory scheme, but, more simply, to determine who – the Receivership Entities, or their payment processor Teledraft – is the proper possessor of those funds.

The most useful precedent I can locate is Magistrate Judge Rice's opinion in *United States v. Payment Processing Center*, 461 F. Supp. 2d 319 (E.D. Pa. 2006). There, the court considered a claim by a third-party bank, Wachovia, that it had a contractual right to funds it held on behalf of the defendant, whose funds had been frozen by a previous order entered by Judge Padova.  Just as in the instant case, the financial services contract between Wachovia and the receivership defendant, PPC, "created a separate contractual right against PPC based on the parties' expansion of Wachovia's charge back and debit rights" to returned remote checks (which were, in the case of *PPC*, processed by the defendant).  *PPC*, 461 F. Supp. 2d at 331.  Nevertheless, Judge Rice held that once the remote checks in that case had officially settled (in that case, after 10 days pursuant to the UCC), the funds associated with them – which were held by Wachovia – were frozen and belonged to the receivership, regardless of any contractual charge-back rights agreed to by the parties.  "Wachovia retains whatever rights its agreement with PPC provides.  The agreement, however, does not preclude the government's § 1345 restraint of PPC's Wachovia accounts." *Id.* at 332.  In other words, although Wachovia retained its contractual claim against PPC, that contractual claim did not alter the fact that the funds held by Wachovia were in fact Receivership property. *See id.* at 321 (noting that "the government bears the burden of proving . . . the restrained property belongs to PPC and not Wachovia" and the government had "met its burden" as

to those funds stemming from transactions that had officially settled).[11]

In the instant case, as in *PPC*, the government has met its burden of showing which settled funds are being held on behalf of an entity subject to a court-ordered receivership.  Thus, the claims of the non-party Teledraft – not the claims of the Receivership – are contractual.  Teledraft's observation that it is not a legal fiduciary or trustee of the NHS/PHS Entities may, as a formal matter, distinguish Teledraft from a bank such as Wachovia, but, insofar as the funds sought by the Receiver here are funds stemming from transactions that have already settled, that distinction is of no moment.  Teledraft processed payments for the NHS/PHS Entities, and, once the transactions processing those payments had settled, those funds belonged to the NHS/PHS entities; they therefore now belong to the Receivership.[12]

---

[11] Teledraft attempts to distinguish *PPC* on the ground that it actually considered a separate issue, namely when the remote checks in that case should have been considered to have settled.  *See* Teledraft's Mem. in Support of Its Special Appearance at 15 n.11 (Docket No. 58, filed under seal on September 29, 2008).  While Teledraft is right that determining the settlement period was the central issue in *PPC*, it was an issue considered en route to Judge Rice's ultimate holding that despite the expanded charge-back rights agreed to by the parties, any post-settlement funds stemming from the remote checks were receivership property.

[12] Because the funds at issue are receivership property, many of Teledraft's arguments about this court's authority lose their force.  For example, Teledraft's repeated references to *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308 (1999), in which the Supreme Court held that a district court did not have the equitable power to enjoin a defendant in a contract dispute from transferring the assets that formed the basis of that dispute, does not prevent this court from enjoining Teledraft's use of the alleged Receivership funds because, unlike *Grupo Mexicano*, the instant controversy is not a contract dispute but is, instead, a dispute about property rights to receivership assets.   The type of situation analyzed by the Court in *Grupo Mexicano* – a dispute between two creditors of the same insolvent corporation – is not analogous to the instant matter

_____Teledraft also claims that even if Teledraft does hold funds that are property of the Receivership, the Receiver has not (and could not have) adequately identified those funds because Teledraft does not keep individual accounts for its clients; therefore, Teledraft argues, it should not be compelled to turn over funds that cannot be precisely identified. Here, as elsewhere in its brief, Teledraft looks to import bankruptcy principles (which, as discussed *supra* in note 10, are of questionable relevance), citing two bankruptcy cases for the proposition that the burden is on the Receiver to separately identify which of Teledraft's funds are part of the Receivership Estate.  However, the Third Circuit case that Teledraft relies on held that, under Section 541 of the Bankruptcy Code, it was possible to trace and identify specific trust funds from commingled accounts and that "the bankruptcy court certainly should keep in mind the broader policy against allowing a party unilaterally to make a trust unenforceable by commingling assets." *City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 102 n.12 (3d Cir. 1994).  Although it is true that Teledraft's accounts are commingled, its virtual accounts provide a clear picture of exactly how much money it held for whom on what date.  Because, therefore, there appears to be no real danger of ordering Teledraft to turn over funds that it actually held for someone other than the NHS/PHS Entities, public policy favors not allowing Teledraft to evade the Receiver by having kept its accounts commingled.

## III.  DUE PROCESS CONCERNS

Having found that the court possesses *in rem* jurisdiction over the funds the Receiver seeks from Teledraft, I now turn to the question of what relief jurisdiction over this matter authorizes the court to award.

A.

Teledraft's major remaining argument is that its status as a non-party renders this court powerless to order it to turn over funds without plenary proceedings (as opposed to the evidentiary hearing held on July 23, 2009).  Although there is not much Third Circuit law in this area, the Ninth Circuit has issued a series of opinions outlining when summary proceedings like those in the instant matter are sufficient to justify a district court's grant of injunctive relief against a non-party.  Based on that line of Ninth Circuit cases, I conclude that this court has authority to order Teledraft to turn over the funds sought by the FTC.

In *United States v. Arizona Fuels*, 739 F.2d 455 (9th Cir. 1984), the Ninth Circuit considered whether to permit summary proceedings to resolve a dispute between a receiver and a company with which the receivership defendant had a standing contract as well as a separate debt.  That defendant, Tenneco, had a contractual right – a right reflected in actual practice – to offset the value of its oil deliveries to the defendant by the amount of money that the defendant owed Tenneco at the time of the delivery.[13]  After a

_____

[13] For example, if Tenneco had a contract to deliver $500,000 of oil monthly to the defendant, and if, at the start of a month, defendant owed Tenneco $300,000, Tenneco would

17

receiver was appointed for the defendant, Tenneco continued this offsetting practice, and the Receiver moved the district court to order the non-party Tenneco to turn over the cash value of the oil offset by Tenneco subsequent to the start of the receivership.

The Ninth Circuit approved the use of summary proceedings in that instance, holding that, *inter alia*, (1) "the traditional rule is that summary proceedings are appropriate and proper to protect equity receivership assets"; (2) summary proceedings are not appropriate "to determine the ultimate merits of the parties' claims to the property," but were appropriate to determine "who was entitled to interim possession of the funds"; and (3) due process was not denied where "Tenneco had ample notice of and opportunity to contest the Receiver's challenge to the claimed setoffs." *Arizona Fuels,* 739 F.2d at 458-59.  *Arizona Fuels* emphasized that the district court had only "determined the Receiver's right to possession of the funds . . . without determining the validity of Tenneco's claims as a creditor of Arizona Fuels." *Id.* at 459.  In other words, Tenneco was free to assert a claim upon the receivership for the money it was owed by the defendant, but it was entirely appropriate for the district court to determine that, in the meantime, Tenneco did not have the right to claim possession of those funds from the receivership.

In accordance with *Arizona Fuels,* which presents the closest factual scenario to the instant matter, summary proceedings are appropriate here for two reasons.  First,

---

deliver $200,000 of oil (thus offsetting the debt).

granting the turnover motion against Teledraft does not resolve Teledraft's contractual claims against the Receivership entities; it merely allocates possession of those funds so that they cannot be dissipated by Teledraft.  Second, Teledraft has had ample notice of these summary proceedings, including an opportunity to brief the issues, produce evidence for the record, and appear in court for an evidentiary hearing.

Since *Arizona Fuels,* the Ninth Circuit has expanded the power of district courts to employ summary proceedings in the context of a receivership.  In *SEC v. American Capital Investments, Inc.,* 98 F.3d 1133 (9th Cir. 1996), *abrogated on other grounds* by *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 93-94 (1998), the Ninth Circuit observed that *Arizona Fuels'*s statement that summary proceedings cannot determine the ultimate rights of the parties was dicta, and it restated the law as follows: "For the claims of nonparties to property claimed by receivers, summary proceedings satisfy due process so long as there is adequate notice and opportunity to be heard."  98 F.3d at 1146 (citations omitted); *see also SEC v. Elliot*, 953 F.2d 1560, 1567-71 (11th Cir. 1992) (analyzing the aforementioned line of Ninth Circuit cases, holding that *Arizona Fuels'* statements about the limits of summary proceedings were dicta, and concluding that "a district court does not generally abuse its discretion if its summary procedures permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts").  Moreover, *American Capital Investments* held, "even if plenary proceedings were appropriate . . . [appellants] must show how they were prejudiced by

19

the summary proceedings and how they would have been better able to defend their interests in plenary proceedings." *Id.* at 1147 (citations omitted).

As I have noted, Teledraft has not shown that it has been prejudiced by these proceedings,[14] and thus the line of Ninth Circuit cases since *Arizona Fuels* only strengthens this court's authority to grant relief for the Receiver on the basis of the summary proceedings already held.

Teledraft, however, insists that summary proceedings are inappropriate because such proceedings should not be used to resolve what is, in essence, a contract dispute between Teledraft and the Receivership entities. This argument is little more than another expression of Teledraft's contention that it does not possess an asset of the *res*. For reasons I explained *supra*, this argument is unpersuasive. *Arizona Fuels* and its progeny reinforce the appropriateness of resolving who should possess receivership funds even when a contract dispute over those funds is pending. In the words of *Arizona Fuels*, Teledraft's argument "would universally preclude summary proceedings to protect receivership assets from illegitimate but minimally articulate possessors," 739 F.2d at

---

[14] Teledraft attempts to show prejudice by critiquing the fashion in which this court entered the XTRO. The XTRO, however, is not relevant to whether the summary proceedings at this stage were or were not sufficient to protect Teledraft's ability to make its case. To demonstrate prejudice, Teledraft must show that its failure to be named as a party has prejudiced its ability persuasively to plead its claim to the funds sought by the Receiver, a showing Teledraft cannot make.

459, and that result is unacceptable.[15]

These Ninth Circuit cases are, admittedly, somewhat in tension with the general

principle that *in personam* jurisdiction is required for the entry of injunctive relief.[16]

---

[15] In support of its argument that plenary proceedings are required to litigate Teledraft's contract claim and that, therefore, summary proceedings are inappropriate, Teledraft also relies on *New Hampshire Fire Ins. Co. v. Scanlon,* 362 U.S. 404 (1960). In *Scanlon,* the IRS (by way of its employee Scanlon) had attempted to recover taxes owed by a delinquent taxpayer (a construction company) by issuing (pursuant to the IRS's statutory authority) a levy against the City of New York for funds that the city owed to the taxpayer (for the construction of a school playground). The petitioner, an insurance company which had been compelled to complete the playground after the construction company defaulted, alleged that *it* was in fact entitled to the city's funds, and the petitioner filed a petition in the district court seeking to quash the IRS's levy.

*Scanlon* held that summary proceedings were not permitted to challenge the "broad powers," 362 U.S. at 408, that the federal official (Scanlon, of the IRS) held over the property. Although the Court did hold that it would not "relax or alter the safeguards of plenary proceedings generally applicable to property controversies in federal courts," it also noted that "courts have sometimes passed on ownership of property in their custody without a plenary proceeding where, for illustration, such a proceeding was ancillary to a pending action or where property was held in the custody of court officers, subject to court orders and court discipline." 362 U.S. at 409-10. In the instant matter, an order of this court appointed the Receiver, a court officer, to be the steward of the Receivership property, and the Receiver's turnover motion is ancillary to the FTC's pending action against the defendants. Accordingly, summary proceedings here are consistent with *Scanlon.*

[16] As a related aside, I note that Teledraft is entirely justified in objecting to the FTC's theory that Rule 65 can provide the basis of an injunction over Teledraft. Rule 65 lays out which non-parties the court has the power to enjoin. "Although injunctions issued by federal courts bind not only the parties defendant in a suit, but also those persons 'in active concert or participation with them who receive actual notice of the order by personal service or otherwise,' Fed. Rule Civ. Proc. 65(d), a nonparty with notice cannot be held in contempt until shown to be in concert or participation." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 112 (1969); *see also Fireman's Fund Ins. Co. v. Myers,* 290 F. Supp. 405, 406 (E.D. Pa. 1968) (collecting cases holding that *in personam* jurisdiction is required for injunctive relief). Teledraft is a nonparty which is not alleged to have participated actively in the defendants' malfeasance. Accordingly, Teledraft is a nonparty not covered by Rule 65(d). *See, e.g., Eli Lilly and Co. v. Premo Pharmaceutical Laboratories, Inc.,* 843 F.2d 1378, 1380 (Fed. Cir. 1988) (holding that injunction did not extend to a third party which could not "be thought of as an instrumentality through which the original defendants seek to evade an order or as a person in active concert or

Cases stating that general principle, however, primarily apply when a party is seeking to

enjoin some specific behavior.  *See, e.g., R.M.S. Titanic, Inc. v. Haver,* 171 F.3d 943 (4th

Cir. 1999) (holding that the exclusive salvor of the sad *Titanic* could not, in an *in rem*

action, obtain an injunction preventing others from leading expeditions to photograph the

wreckage of the ship).  Those cases are less apposite in the instant case, however, because

here the court is considering, in the context of an underlying *in personam* lawsuit, how to

allocate the receivership property itself.  To require anything more than *in rem*

jurisdiction in order to empower a court to simply determine the proper possessor of that

*res* would essentially strip *in rem* jurisdiction of any force or meaning.  Thus, insofar as

this court's orders apply to the right to possess and dispose of Receivership funds, the

orders are, I conclude, entirely within the court's authority to issue.


B.

        Teledraft also contends that it has an equitable right to setoff/recoup money owed

by the NHS/PHS Entities to Teledraft *before* Teledraft can be forced to turn over any

funds to the Receivership.  According to Teledraft, "[t]he Contracts govern the

relationship [with the Receivership entities], and indisputably entitle Teledraft to recoup

the chargebacks caused by the Receivership Entities' alleged bad acts."  *See* Docket No.

58 at p. 31.  In support of this argument, Teledraft notes that there is a "a strong federal

_____

participation with those defendants").

policy towards allowing setoff" and that a "'decision disallowing a setoff must not be made cavalierly.'"  *SEC v. Elliott,* 953 F.2d 1560, 1572 (11th Cir. 1992) (citing *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1165 (2d Cir.1979)).  Thus, says Teledraft, "[t]he district court must weigh the equities to determine whether to allow setoff."  *Elliott,* 953 F.2d at 1572 (citing *Bohack,* 599 F.2d at 1169).

In order to rebut this argument, the FTC claims that equity favors disallowing any right to setoff that Teledraft may posses.  FTC accuses Teledraft of engaging in risky business ventures with the NHS/PHS Entities, which Teledraft knew did not qualify for ACH servicing because of their high rates of return.[17]

However, due process, according to the Ninth Circuit's opinion in *SEC v. Ross,* 504 F.3d 1130 (9th Cir. 2007), requires that a receiver have full *in personam* jurisdiction if it is going to adjudicate issues of "substantive liability."  504 F.3d at 1144 (holding that summary proceedings were inappropriate where the SEC's disgorgement motion was premised on illegal behavior by the nonparty against which the motion had been brought).  *Ross's* holding is sensible, for once a district court begins to allocate blame, it is no longer merely transferring *res* to the receiver, but is instead addressing the underlying rights of the parties.[18]  Accordingly, this court will not consider the FTC's equitable arguments

---

[17] The FTC also asserts that by servicing NHS using ACH transfers, Teledraft was in violation of a court order in a different case that requires Teledraft to comply with NACHA regulations.  *See Iowa v. Teledraft*, No. 4:04-CV-90507 (S.D. Iowa Dec. 9, 2005).

[18] Teledraft has relied heavily on *Ross* throughout its submissions.  *Ross*, however, did not abrogate the long line of Ninth Circuit cases permitting summary proceedings; it merely

because the FTC has not made Teledraft a party to this litigation.

The FTC's unclean hands theory is not, however, necessary to resolve this issue because Teledraft has not actually asserted a right to setoff in the first place. "The right to setoff exists where there are mutual debts between parties." *Elliot,* 953 F.2d at 1572 (citing *Lowden v. Northwestern Nat'l Bank & Trust Co.*, 298 U.S. 160 (1936)). Here, there are no mutual debts between the parties; there are, as Teledraft emphasizes, potential contract claims that do not allege unpaid debt. These contract claims are separate from the issue of whether (if at all) the defendants have failed to compensate Teledraft. Moreover, Teledraft's setoff argument largely recalls *Arizona Fuels,* in which the Ninth Circuit held that a nonparty could not engage in setoff and should instead seek a separate judgment in contract. Thus, without examining the propriety of Teledraft's conduct, I conclude that Teledraft has no setoff right that can trump the Receiver's claim to the Receivership funds.

In addition to its "setoff" theory, Teledraft contends that its keeping of some of the NHS/PHS Entities' funds is permissible under a theory of "recoupment." As a threshold

---

clarified that those proceedings cannot be used to resolve disputes that involve equitable judgments about a non-party's behavior. In *Ross*, the SEC sought to disgorge commissions earned by salesmen who were working for a company that had violated federal securities fraud. *Ross* distinguished itself from the *Arizona Fuels* line of cases, holding that "because the Receiver's disgorgement claim turns on [the non-party's] violation of the securities laws . . . this is not a case involving the mere determination of who is entitled to possession of the funds" and therefore requires "full *in personam* jurisdiction." 504 F.3d at 1144. In the instant matter, therefore, *Ross's* prescription is honored so long as this court makes no holding with respect to Teledraft's wrongdoing, or lack thereof.

matter, Teledraft appears to be correct that recoupment, and not setoff, is the more appropriate theory of recovery here.  Although the two doctrines "are often confused," the major difference is that setoff involves two independent debts between the parties, whereas recoupment applies when a defendant has a counterclaim against a plaintiff that arises "out of the very contract giving rise to the plaintiff's claim."  *FDIC v. Marine Midland Realty Credit Corp.,* 17 F.3d 715, 722 (4th Cir. 1994) (citation omitted) (allowing a recovery against a receivership based on a recoupment theory).  Here, where the Receivership's claim to Teledraft's funds and Teledraft's contractual counterclaim both arise out of the same contracts, recoupment, and not setoff, is the right asserted by Teledraft.

However, a cardinal requirement in a recoupment action is that "the liability is absolute and certain in amount."  *Id.* (noting that the defendant's claim against the receiver was "for the certain sum representing [plaintiff's] unpaid share of loan advances").  Teledraft's claim here is a highly contestable contract claim alleging that the NHS/PHS Entities have forfeited their holdings with Teledraft; the amount of any judgment that might stem from that contract claim is not a certain and absolutely identifiable sum.  Accordingly, Teledraft's recoupment theory fails.

## IV.  RELIEF

Having found that Teledraft is in possession of Receivership property and that this

court's use of summary proceedings has not violated Teledraft's due process rights, I now

turn to the final issue of the relief I will grant.  Teledraft represents that, as of July 2,

2009, it possesses only $57,328.89 on behalf of the NHS/PHS Entities.  Moreover, it

claims, the fact that the Receiver was not appointed as to PHS-3 and PHS-4 until June 10,

2008 means that the May 21, 2008 date used by the Receiver in his calculations is not the

proper date around which a turnover order should be constructed.  Both of these

arguments fail, however, because Teledraft was bound by the language of the XTRO, and

its decision to disregard the XTRO should not be permitted to decrease the relief afforded

to the Receiver.

The XTRO applied to "the Receivership Defendant," defined in the XTRO as

"NHS Systems, Inc. . . . and any of its affiliates, subsidiaries, or divisions."  Based on the

scheme alleged by the FTC here, the NHS/PHS Entities were all affiliates of one another.

Accordingly, the XTRO froze, as Teledraft surely would have understood it did,

Teledraft's right to transfer the funds of all the NHS/PHS Entities (one of which, PHS-4,

was also a defendant in the original complaint).  That the SPI was not entered until June

10, 2008, thus is of no importance.  Meanwhile, Teledraft was bound to obey this court's

asset freeze order, regardless of the propriety of that order.  *See United States v. United*

*Mine Workers,* 330 U.S. 258 (1947).  Teledraft's decision to continue depleting the

NHS/PHS Entities' funds was, therefore, unlawful.  This court will therefore award

monetary relief as if Teledraft had, in fact, obeyed this court's orders, and Teledraft will

be ordered to turn over the amount of funds requested by the FTC.

Teledraft has also requested that this court lift the litigation stay currently in place. The Third Circuit has held that district courts have an "inherent power . . . to enter a valid stay of litigation effective even against nonparties to the receivership action." *United States v. Acorn Tech. Fund,* 429 F.3d 438, 442 (3d Cir. 2005). *Acorn* adopted the Ninth Circuit's three-part test for determining when a litigation stay should be lifted:

> (1) [W]hether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim.

429 F.3d at 443 (quoting *SEC v. Wencke,* 742 F.2d 1230, 1231 (9th Cir.1984)).

Applying the test from *Acorn*, I conclude that the litigation stay should be lifted so that Teledraft can pursue its contract claim against the Receivership.  First, lifting the litigation stay will cause little harm to the status quo, which is already characterized by extensive litigation, because the funds at issue will have already been turned over. Second, it has now been more than a year since the formation of the Receivership. Finally, Teledraft appears to have a contract claim of colorable merit.  *See Acorn*, 429 F.3d at 443 ("Far into a receivership, if a litigant demonstrates that harm will result from not being able to pursue a colorably meritorious claim, we do not see why a receiver should continue to be protected from suit.").

In sum, Teledraft must turn over to the Receiver the funds the Receiver has

27

requested, but it may, once those funds have been turned over, initiate a contract claim

against the Receivership for the funds to which Teledraft alleges it is contractually

entitled.