IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| FEDERAL TRADE COMMISSION | : | CIVIL ACTION |
| | : | |
| v. | : | No. 08-2215 |
| | : | |
| NHS SYSTEMS, INC., et al. | : | |


## MEMORANDUM

**Juan R. Sánchez, J.**                                                    **March 28, 2013**

      Plaintiff Federal Trade Commission (FTC) brings this action against corporations and individuals for violations of § 5(a) of the Federal Trade Commission Act (FTCA), 15 U.S.C. § 45(a), and the Telemarketing Sales Rule (TSR), 16 C.F.R. Part 310. The FTC's Amended Complaint names the following corporate defendants: NHS Systems, Inc.; Physician Health Service, LLC; Plus Health Savings, Inc.; Physicians Health Systems, Inc.; Health Management, LLC; 6676529 Canada, Inc.; Physicians Health Systems Enterprises, Inc.; First Step Management, Inc.; Gold Dot, Inc.; and Nevada Business Solutions, Inc. (collectively, the "NHS/PHS Defendants"). The FTC also pursues claims against individual defendants, including: Nicole Bertrand; Barry Kirstein; David James Greer; Tasha Jn Paul; and Linke Jn Paul (collectively, the "individual defendants").[1] The FTC asks the Court to hold each of the Defendants liable for engaging in an international enterprise to obtain millions of dollars from United States consumers through deceptive marketing practices and unauthorized charges to financial accounts.

---

[1] Defendants Donna Newman, Harry F. Bell, Jr., John E. Bartholomew, Interface Management, Inc., and Beginning Again, Inc. were dismissed as defendants pursuant to stipulated "final orders" they entered into with the FTC to resolve all claims against them.

Based upon the facts and evidence in the record, Defendants violated § 5(a) of the FTCA and the TSR. The NHS/PHS Defendants were engaged in a common enterprise and are jointly and severally liable. The individual defendants directly participated in or had authority to control the deceptive practices, knew, or should have known, of the deceptive conduct perpetuated within the corporations, and are personally liable. The Court will grant the FTC's motion for summary judgment.

**FACTS**[2]

The NHS/PHS Defendants employed telemarketers to initiate calls to consumers, attempt to enroll them in supposed healthcare discount programs, and obtain their financial information. These programs were intended for people who did not have healthcare insurance. Typically, the telemarketers promised consumers they would receive substantial deposits into their bank accounts if they provided their bank account information. They stated the deposits would be in the form of grants, tax refunds, or tax rebates. Instead, the telemarketers would cause the bank accounts to be debited once or multiple times. The telemarketers would use deceptive tactics in an attempt to obtain recorded "verifications" by the consumers for authority to debit their accounts. The NHS/PHS Defendants used recorded telephone verifications as proof of such authorization. Some authorizations were forged or altered. Many consumers who later heard their supposed voice authorizations stated the recording featured imposters or admitted the recording was their own voice, but that the recording was incomplete or manipulated. If a

---

[2] "On a motion for summary judgment, a district court must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). Defendants Tasha Jn Paul and Linke Jn Paul are the only defendants who filed responses in opposition to the FTC's motion. However, they did not provide the Court with a statement of the facts, nor did they provide any evidence or documentation in support of their arguments that they should not be personally liable.

consumer complained about a charge, the NHS/PHS Defendants would typically claim the charges were authorized, even if there was no recorded authorization available or the recorded authorization was available, but contained another person's voice.

The NHS/PHS Defendants utilized two consumer lists, which apparently contained individuals' names and contact information and were updated with their financial information if they enrolled in a healthcare program. The first list ("Database 1") was created by obtaining customer information from multiple pre-December 2006 telemarketing campaigns which had been overseen by several of the individual defendants. Nicole Bertrand and Barry Kirstein testified the NHS/PHS telemarketers sold the consumers in Database 1 various discount healthcare programs and their bank accounts were charged monthly "residuals" to maintain their membership. The second list ("Database 2") included all post-December 2006 enrollees who were immediately charged $29.95 to receive information, $299.95 to enroll, and $19.95 per month thereafter. Each NHS/PHS affiliated company used the databases. The financial information contained therein was used to obtain money from consumers' bank accounts and distribute it throughout the NHS/PHS enterprise.

The FTC takes no position as to whether the underlying discount healthcare programs were legitimate. The FTC focuses on the manner in which consumers' bank information was obtained and how consumers were charged. The FTC contends the Defendants' primary purpose was to deceptively obtain consumers' financial information and debit their accounts.

During the course of the telemarketing campaign, the NHS/PHS Defendants misrepresented the cost of the discount healthcare programs. Defendants' telemarketers told the consumers they would not be charged, misstated the cost of the programs, or indicated the consumer would receive a future credit to offset any debit. The NHS/PHS Defendants sold a

healthcare program to several customers which was actually a free program. Jan Sesso, CEO of Universal RX, a prescription discount benefit provider, testified his company was alarmed when it received multiple calls from consumers indicating they had been charged hundreds of dollars to enroll in a program which was supposed to be offered to consumers free of charge. The NHS/PHS telemarketers also posed as government employees, such as representatives of Medicare, the Internal Revenue Services, and the Social Security Administration.

The NHS/PHS corporations were founded by several of the same individual defendants. In December 2006, PHS Enterprises formed to target consumers listed in Database 1. Bertrand and Kirstein were named as the primary contacts for the entities that processed PHS Enterprises' payments. In June 2007, Bertrand and Kirstein instructed Harry Bell to form the corporation Plus Health Savings. Plus Health Savings began charging consumers in Database 1 at the direction of Bertrand, Kirstein, and Tasha Jn Paul.

Also in December 2006, NHS Systems formed and began to accumulate and target new consumers, creating the consumer list in Database 2. Bertrand, Kirstein, and Tasha Jn Paul managed NHS Systems. Harry Bell was the nominal president of NHS Systems and was responsible for maintaining the bank accounts and reviewing and forwarding complaint mail received from consumers. Almost immediately, NHS Systems received several consumer complaints about their telemarketers falsely offering grants. By mid-November 2007, Bell was inundated by consumer complaints and emailed Bertrand detailing his concerns. In November 2007, Donna Newman formed Health Management, which began debiting NHS Systems' consumers' accounts in Database 2.

In November 2007, Newman formed Physician Health Service and Bell formed Physicians Health Systems. Both companies were a part of a new telemarketing campaign

referred to as American Health Benefits on Line, but again were similar to the other corporations in the NHS/PHS enterprise.

After each company was established and began operating, the telemarketers called consumers and attempted to obtain their financial information. The NHS/PHS Defendants then debited consumers' accounts and transferred the money to one of three "siphoning entities." These companies included Defendants First Step Management, Gold Dot, and 6676529 Canada.[3] First Step Management received over one million dollars from NHS/PHS Defendants, making it the largest single recipient of such transfers. Linke Jn Paul is listed as First Step Management's director, and Tasha Jn Paul and David Greer operated the company. Gold Dot received hundreds of thousands of dollars from the NHS/PHS scheme. Linke and Tasha Jn Paul are listed as Gold Dot's directors. Finally, 6676529 Canada, Inc. also received funds from the NHS/PHS Defendants. Bertrand is the president of 6676529 Canada, but both she and Kirstein shared control and distribution of the profits. Their home address is also the company's principle place of business.

On May 13, 2008, the FTC initiated the instant suit against NHS Systems, Physician Health Service, Bell, and Newman. It also filed an ex parte motion for a temporary restraining order (TRO). On May 14, 2008, Judge Pollak issued a TRO against those Defendants and the "persons or entities in active concert or participation with them." TRO, dated May 16, 2008, ECF No. 6.

On May 27, 2008, Nevada Business Solutions formed. In early June 2008, Greer, using the name Dannie Boie, contacted Financial Marketing Concepts, Inc. (FMC). Greer explained that he represented Nevada Business Solutions, a company that had thousands of existing clients

---

[3] The siphoning entities also included non-defendants Delway Trading and First Solutions.

whose discount healthcare plan provider could no longer serve them. FMC agreed to accept the clients for its MedValues Plus discount program, believing Nevada Business Solutions had sold healthcare plans to all of its customers. Nevada Business Solutions and FMC executed a written agreement, in which Greer asked FMC to bill the consumers in Database 1, and then bill the consumers in Database 2.

Bertrand and Greer also arranged a new telemarketing campaign to sell FMC's benefit programs. In January 2009, they used telemarketer scripts similar to those used in past campaigns and a consumer list generated by the NHS/PHS Defendants. The campaign's script and other documents were emailed from an address associated with NHS Systems. Soon after initiating the campaign, FMC received consumer complaints and FMC's payment processor froze FMC's funds. Bertrand and Greer's telemarketers were again claiming affiliation with government agencies and promising grants. Some consumers complained their bank accounts were charged without prior notice from the company.

**PROCEDURAL HISTORY**

On July 6, 2009, the FTC filed an Amended Complaint adding the remaining NHS/PHS Defendants and individuals Defendants.[4] The Amended Complaint contains the following Counts alleging violations of the FTCA: (1) deceptive claims of government affiliation; (2) deceptive claims to offer government grants, tax refunds, or tax rebates; (3) deceptive claims regarding cost; (4) failure to disclose material facts; and (5) unfair unauthorized charges. The

---

[4] On June 30, 2009, the FTC filed a motion for leave to file and serve the Amended Complaint and requested authorization from the Court to employ alternative means of service. ECF No. 76. On July 6, 2009, this Court issued an Order granting the FTC's request. ECF No. 87. Kirstein, Bertrand, and Linke Jn Paul were personally served. Greer and Tasha Jn Paul were also served via email. The FTC contends Tasha fled the United States at the same time her husband, Linke Jn Paul, and their business associates were served. The FTC's service of the Amended Complaint is adequate.

Amended Complaint also contains the following Counts asserting violations of the TSR: (6) failure to disclose material conditions; (7) misrepresenting total cost; (8) misrepresenting nature of services; (9) misrepresenting affiliation with government; and (10) lack of express verifiable authorization.[5]

On October 1, 2010, the FTC filed a motion for summary judgment. Tasha Jn Paul and Linke Jn Paul, who are husband and wife, are the only defendants who responded and filed pro se briefs in opposition to the motion. On May 12, 2011, the Court found Teledraft, a payment-processing firm that handled funds for several of the Defendants, in contempt of this Court's September 24, 2009, Order. Telegraph appealed the Order to the Third Circuit Court of Appeals on May 19, 2011.

On August 9, 2011, the Court ordered notice of the FTC's motion for summary judgment be sent to all Defendants, as a majority of the remaining Defendants appeared to be pro se and had not responded to the motion. On September 19, 2011, Tasha and Linke Jn Paul filed separate responses to the FTC's motion. David James Greer, also known as Dannie Boie, filed a pro se motion for an extension of time to respond. The request was granted. To date, Greer has not filed a response. The remaining Defendants have not responded to the FTC's motion for summary judgment.

On May 15, 2012, this case was reassigned to the undersigned Judge for all further proceedings. A status conference was held on July 9, 2012. The only motion currently pending before the Court is the FTC's motion for summary judgment.

**DISCUSSION**

---

[5] Counts 11 and 12 are asserted against the "Galaxy Defendants," who have been dismissed from the suit.

The FTC moves for summary judgment, claiming there are no genuine issues of material fact and the evidence shows the NHS/PHS Defendants and individual Defendants violated § 5(a) of the FTCA and the TSR. Tasha and Linke Jn Paul oppose the motion, but did not submit any supporting affidavits, exhibits, or evidence.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must "bear[] the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party has carried its initial burden, the nonmoving party must then "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). "To survive a motion for summary judgment, the non-moving party cannot solely rest upon her allegations in the pleadings, but rather must set forth specific facts such that a reasonable jury could find in the non-moving party's favor, thereby establishing a genuine issue of fact for trial." *Hugh*, 418 F.3d at 267 (citing Fed. R. Civ. P. 56(e)). Summary judgment is warranted where a party "fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

"If the adverse party does not . . . respond, summary judgment, if appropriate, shall be entered against the adverse party." *SEC v. J.W. Barclay & Co., Inc.*, 442 F.3d 834, 840 (3d Cir. 2006) (quotation omitted). With regard to unopposed summary judgment motions, "[w]here the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law." *Gaspar v. Merck & Co., Inc.*, 118 F. Supp. 2d 552, 555 (E.D. Pa. 2000) (citing *Anchorage Assoc. v. V.I. Bd. of Tax Review*, 992 F.2d 168, 175 (3d Cir. 1990)). "[C]ourts cannot grant motions for summary judgment merely because they are unopposed, even if no response is ever filed." *Fekade v. Lincoln Univ.*, 167 F. Supp. 2d 731, 738 (E.D. Pa. 2001) (citing E.D. Pa. R. Civ. P. 7.1(c)).

There are no genuine disputes of the material facts in the present case; thus, the Court must determine whether the FTC is entitled to judgment as a matter of law. First, the FTC claims the NHS/PHS Defendants violated § 5(a) of the FTCA. The provision prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). An act or practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Id.* § 45(n). "To establish that an act or practice is deceptive under Section 5, the FTC must demonstrate that '(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances; and (3) the representation was material.'" *FTC v. Magazine Solutions, LLC*, No. 7-692, 2010 WL 1009442, at *11 (W.D. Pa. Mar. 15, 2010) (citing *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)); *see also FTC*

*v. Millennium Telecard, Inc.*, No. 11-2479, 2011 WL 2745963, at *3 (D.N.J. July 12, 2011) (same); *FTC v. Davison Assocs., Inc.*, 431 F. Supp. 2d 548, 559 (W.D. Pa. 2006) (same). Under the second element, "'[a]ctual deception of the consumers need not be proven; rather, the likelihood of deception or the capacity to deceive is the criterion by which the advertising is judged." *Magazine Solutions, LLC*, 2010 WL 1009442, at *12 (citation omitted). "A practice or statement is material if it contains information that is important to a consumer's purchasing decision . . . ." *Davison Assocs., Inc.*, 431 F. Supp. 2d at 559 (citation omitted). "Explicit claims or deliberately-made implicit claims . . . are presumed to be material." *In re Nat'l Credit Mgmt. Grp.*, *L.L.C.*, 21 F. Supp. 2d 424, 441 (D.N.J. 1998). Intent to deceive is not a required element to establish a deceptive practice. *See id.*; *see also Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976); *Millennium Telecard, Inc.*, 2011 WL 2745963, at *3.

The FTC claims NHS/PHS Defendants violated § 5(a) of the FTCA in that: (1) Defendants' telemarketers expressly claimed or represented they were calling on behalf of federal agencies, which was false and a material misrepresentation upon which consumers were entitled to rely; (2) the telemarketers unjustifiably offered government grants and refunds, which is false and a material misrepresentation upon which the consumer were likely to rely; (3) the telemarketers assured consumers they would not be charged or the charges would be offset by deposits into their accounts; (4) telemarketers told some consumers they were offering a risk-free trial of the discount programs, but the NHS/PHS Defendants charged consumers before disclosing any material terms or conditions; (5) Defendants' actions and practices satisfy the statutory definition of "unfair," as (a) they caused substantial consumer injury by debiting consumer accounts; (b) consumers who did not authorize the charges could not reasonably have

avoided unauthorized debits; and (c) there was no countervailing benefit to consumers or competition.

This Court agrees with the FTC, as the undisputed facts show the NHS/PHS Defendants violated § 5(a) of the FTCA. Their conduct was unfair, as it caused and was likely to cause substantial financial injury to the consumers. The consumers could not reasonably avoid the limitless financial consequences of providing their account information for a supposed discount healthcare program. Additionally, any countervailing benefit the consumers may have received from enrolling in the programs was far outweighed by the financial burden and misfortune of being placed on one of the NHS/PHS Defendants' databases.

The NHS/PHS Defendants' conduct was also deceptive. Defendants' telemarketers made several misrepresentations to the consumers. The FTC does not need to demonstrate Defendants intended to deceive the consumers; rather, it must only establish the representations were likely to mislead customers acting reasonably under the circumstances. The FTC has met its burden. The telemarketers misrepresented information about the programs and the enrollment, including the total cost and their affiliation with government agencies. These representations were material, as they would have affected the consumer's purchasing decision and the consumers would have justifiably relied on the information. The NHS/PHS Defendants violated the FTCA. Accordingly, summary judgment will be granted in the FTC's favor as to the FTCA claims against the NHS/PHS Defendants.

The FTC also claims the NHS/PHS Defendants violated the TSR. The TSR requires a seller or telemarketer to truthfully disclose "[a]ll material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer" before a consumer consents to pay. 16 C.F.R. § 310.3(a)(1)(ii). A seller or telemarketer engages in a

deceptive act or practice under the TSR when it misrepresents "[t]he total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer," *id.* § 310.3(a)(1)(i); "[a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer," *id.* § 310.3(a)(2)(iii); or an "affiliation with, or endorsement or sponsorship by, any person or government entity," *id.* § 310.3(a)(2)(vii).

It is also deceptive for a seller or telemarketer to "caus[e] billing information to be submitted for payment, or [to] collect[] or attempt[] to collect payment for goods or services . . . without the customer's . . . express verifiable authorization," except in limited circumstances involving credit and debit cards, which have other verification protections. *Id.* § 310.3(a)(3). The TRS permits a telemarketer to obtain express verifiable authorization by taped oral authorization; however, the recording must clearly demonstrate the consumer's authorization of payment and that the consumer received specific information, including the number and amounts of debits, the dates charges will be submitted for payment, and a telephone number for customer questions that is answered during normal business hours. *Id.* § 310.3(a)(3)(ii).

The undisputed facts also demonstrate the NHS/PHS Defendants violated several provisions of the TSR. Their telemarketers misrepresented the total cost of the programs. The customers were overcharged, charged without enrolling in a program, or were charged to enroll in free programs. Some customers were told that they would not be charged at all or that the charge would be offset by a greater deposit in the future. The telemarketers also misrepresented material aspects of the goods and services. The discount healthcare programs were intended for individuals who did not have healthcare insurance. However, affidavits and depositions testimony of consumers demonstrate some of the consumers the telemarketers enrolled had

health insurance and were not informed of this material aspect of the program. Moreover, some of those individuals were not removed from the program despite their efforts to contact the Defendants to request cancellation of the program. The consumers were also misled about who was authorized to access their accounts and how frequently such debits would occur. Additionally, one of the NHS/PHS corporations sent its consumers the wrong contact information and did not notify them of the error once it was corrected.

The NHS/PHS Defendants' use of audio authorization recordings also did not comply with the TSR. A company debiting an account is required to maintain a record which clearly demonstrates the consumer's authorization of payment with specific information. Many consumers stated the purported authorizations recordings played to them were not authentic or had been altered. This conduct violates the TSR and, therefore, the Court will grant summary judgment in favor of the FTC with regard to the TSR claims against those Defendants.

The FTC contends the NHS/PHS Defendants operated their scheme as one common enterprise, which makes each corporation jointly and severally liable for the acts and practices of the others. This Court agrees the Defendants operated a common scheme as one enterprise and will be held jointly and severally liable for injuries caused by violations of the FTCA. *See Millennium Telecard, Inc.*, 2011 WL 2745963, at *8. To determine whether a common enterprise exists, courts consider "a variety of factors, including: common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, unified advertising, and evidence which reveals that no real distinction existed between the Corporate Defendants." *Id.* (quoting *FTC v. Wolf*, No. 94-8119, 1996 WL 812940, at *7 (S.D. Fla. Jan. 31, 1996) (internal quotation marks omitted)). Courts have found a common enterprise where the "corporations are so entwined that a judgment absolving one of them of

liability would provide the other defendants with a clear mechanism for avoiding the terms of the order . . . ." *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011) (citing *F.T.C. v. Nat'l Urological Grp.*, *Inc.,* 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008) (quotation marks omitted)).

Based upon the evidence pertaining to the relationship of the companies, the NHS/PHS Defendants were engaged in a common enterprise and will be held joint and severally liable. There was a common and dependent relationship between the corporations, with overlapping actors and a common scheme. The companies shared the same lists of consumers, employed the same telemarketing tactics, and provided their telemarketers the same or similar scripts. The corporations within the NHS/PHS enterprise charged customers on behalf of other corporations. Bertrand and Tasha Jn Paul also had overlapping duties between the NHS/PHS corporations. The profits were split between the siphoning entities. Given the common control, officers, and customers, there was no real distinction between any of NHS/PHS corporations. As such, they will be held jointly and severally liable as a common enterprise.

Under the FTCA, once the corporation is found liable, the individuals involved in those corporations may also be held personally liable. "'An individual will be liable for corporate violations of the FTC Act if (1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth.'" *Millennium Telecard, Inc.*, 2011 WL 2745963, at *9 (quoting *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009)). Authority to control can be demonstrated by a defendant's active involvement in business affairs, establishment of corporate policy, or assumption of the duties of a corporate officer. *FTC v. Chinery*, No. 05-3460, 2007

WL 1959270, at *6 (D.N.J. July 5, 2007) (quotation and citations omitted). A defendant's knowledge may be demonstrated by evidence that he or she knew or should have known of the material representations or awareness of a high probability of fraud with intentional avoidance of the truth. *Id.* (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 574 (7th Cir. 1986)). The degree of the defendant's participation in business affairs is probative of his knowledge. *Id.* Again, the FTC is not required to show a defendant intended to defraud consumers to hold him personally liable. *Millennium Telecard, Inc.*, 2011 WL 2745963, at *13 (citation omitted). The same causation requirements for FTCA violations apply to the TRS. *FTC v. Hope Now Modifications, LLC*, No. 09-1204, 2010 WL 1463008, at *1 (D.N.J. Apr. 12, 2010) (citing 15 U.S.C. § 6105(b)).

The individual Defendants are personally liable due to their knowledge of the deceptive schemes employed within the NHS/PHS corporations in which they had substantial control. These same individual defendants were involved in establishing, managing, and supervising the corporations' operations. Bertrand assumed multiple managerial positions in various corporate entities. She administered PHS Enterprise's finances, directed some payments to go to First Step Management, and ensured consumers demanding refunds received them. She was the first point of contact for the corporate entities with various payment processors. She directed Greer and customer service representatives to issue refunds to consumers if they complained. Thus, she knew about the telemarketers' misrepresentations resulting in complaints and subsequent refunds. She also participated directly and had the ability to control the practices and the circulation of the money between the corporations.

Kirstein also had a lot of authority and oversaw the marketing aspects of the NHS/PHS corporations. He reviewed unauthorized debits and directed how the profits were divided. He

knew or should have known about the deceptive practices due to the complaints of misrepresentations. Greer also oversaw the daily operations of sales and customer service in First Management. He also knew about the consumer complaints.

Tasha and Linke Jn Paul claim they should not be held personally liable for the violations by the NHS/PHS corporations because the FTC failed to show they intended to deceive consumers or they had direct knowledge of the deception. Tasha acknowledges that she worked for First Step Management and Gold Dot, and explains her duties were limited to locating call centers, acting as middleman between the call centers and NHS/PHS Defendants for the purpose of paying the calls centers and generating leads. She contends the FTC failed to show her involvement in the creation of the false recordings or deception. Instead, she argues, a non-party company handled recordings and verifications. Tasha also disclaims any control over the consumer lists or billing.

Linke Jn Paul asserts he had little to no direct involvement with the NHS/PHS Defendants and the FTC only argues he was the director of two of the siphoning entities without proof. He also argues his participation was limited to locating call centers, being a middleman between the centers and the NHS/PHS Defendants, and generating leads. He disclaims any control over the consumer lists or billing. Linke claims First Step Management received money from the NHS/PHS corporations to pay for the call centers. He also asserts he received minimal consultation fees that in no way reflect a fraction of the gross amounts the FTC seeks in damages.

This Court disagrees with Tasha and Linke Jn Paul that the FTC failed to show their involvement in the telemarketing scheme perpetrated by the rest of the NHS/PHS Defendants. Both of them assert, without any evidence or support of their contentions, that they were not

aware of the deception and did not participate in the scheme. The record, however, shows otherwise. Tasha—or sometimes referred to as "Erika Roberts"—had a major role in the management of the companies and was aware of the returns and complaints received regarding the misrepresentations by the telemarketers. The FTC provided emails from Tasha, which demonstrate her knowledge of the NHS/PHS operations, the receipt of complaints, and required consumer refunds. Linke was a director of the two siphoning companies, which were clearly receiving money from the other NHS/PHS Defendants. Linke is listed on the articles of incorporation for the companies. Due to his role in two of the siphoning companies, the receipt of over one million dollars from the NHS/PHS corporations, his partnership with Tasha who was incredibly knowledgeable of the NHS/PHS operation, and his supervision and control of the call centers, even if Linke did not have actual knowledge of the material representations, he must have been recklessly indifferent to the truth or falsity of the telemarketers' misrepresentations or been aware of the high probability of fraud. Tasha and Linke Jn Paul are, therefore, personally liable for the damages.

It is no coincidence that the same pattern of complaints about purported government affiliation, false offers of grants and refunds, and misrepresentations of the total costs followed the same individual defendants from company to company. All of the individual defendants were at one time or another put on notice of the consumer complaints. They also directly participated or had authority to control the misrepresentations and deceptive practices. Furthermore, the FTC does not have to show they intended to deceive the consumers. Bertrand's payment process calculations for some of the campaigns indicated that the NHS/PHS corporations had a rate of returns above 50%. In each of their roles, the individual Defendants knew or should have known of the deceptive practices due to the numbers of complaints.

As all of the Defendants, both corporate and individual, will be held liable in the instant case, the Court will now consider the FTC's requested relief. The FTC asks for a permanent injunction imposing the following restrictions: (1) banning the Defendants from engaging in telemarketing and from debiting consumer bank accounts; (2) enjoining them from making misrepresentations and from violating the TSR; (3) ordering monetary relief in the amount of $6,879,162.22; and (4) permitting the FTC to monitor their compliance. The FTC argues the requested relief is appropriate under Section 13(b) of the FTCA.

Section 13(b) of the FTCA provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b)(2). "This granting of permanent injunctive power 'also [gives a] court authority to grant any ancillary relief necessary to accomplish complete justice because it [does] not limit th[e] traditional equitably power explicitly or by necessary and inescapable inference.'" *In re Nat'l Credit Mgmt. Grp, L.L.C.*, 21 F. Supp. 2d at 429 n.3 (quoting *Amy Travel Serv. Inc.,* 875 F.2d at 571). "A permanent injunction is justified when there is a 'cognizable danger of recurrent violation,' *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), or 'some reasonable likelihood of future violations.'" *FTC v. Bonnie & Co. Fashions, Inc.*, No. 90-4454, 1992 WL 314007, at *6 (D.N.J. Sept. 28, 1992) (quoting *CFTC v. Co Petro Mktg. Grp., Inc.*, 502 F. Supp. 806, 818 (C.D. Cal. 1980)); *see also FTC v. Pac. First Benefit, LLC*, 472 F. Supp. 2d 974, 981 (N.D. Ill. 2007) (finding a case where defendants "used deceptive acts and practices to defraud consumers of millions of dollars," constitutes such a "proper case" to impose a permanent injunction). "In determining whether there is a danger of recurrence, a court may consider the bona fides of the expressed intent to comply, the effectiveness of the discontinuance, and, in some cases, the

character of past violations." *Davison Assocs., Inc.*, 431 F. Supp. 2d at 560 (citing *W.T. Grant Co.*, 345 U.S. at 633).

"Ancillary equitable relief may take the form of disgorgement of the full amount lost by customers, without regard to defendant's profits." *Id.* (citing *Commodity Futures Trading Comm'n v. Am. Metals Exchange Corp.*, 991 F.2d 71, 77 (3d Cir. 1993); *FTC v. Febre*, 128 F.3d 530, 537 (7th Cir. 1997); *FTC v. Medicor LLC*, 217 F. Supp. 2d 1048, 1057-58 (C.D. Cal. 2002)). "A corporation is liable for monetary relief under Section 13(b) if the FTC shows that the corporation engaged in misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted." *In re Nat'l Credit Mgmt. Grp., L.L.C.*, 21 F. Supp. 2d at 462 (citation omitted).

Initially, the Court will grant the FTC's request to enjoin the Defendants from making misrepresentation and violating the TSR, which simply requires the Defendants to abide by the law. The Court will also grant the FTC's request for a permanent injunction banning the Defendants from telemarketing and from debiting consumer bank accounts. Tasha and Linke Jn Paul argue that a lifetime ban from telemarketing, their sole source of income and chosen profession, amounts to slavery in violation of the Thirteenth Amendment. An order banning their participation in telemarketing would force them out of one industry and into another. The FTC argues that strict industry bans are lawful and warranted in this case. The FTC cites district court opinions enjoining individuals from participating in particular lines of business. The Third Circuit has also held that "the critical factor in every case finding involuntary servitude is that the victim's only choice is between performing the labor on the one hand and physical and/or legal sanctions on the other . . . ." *Steirer by Steirer v. Bethlehem Area Sch. Dist.*, 987 F.2d 989, 999 (3d Cir. 1993). Because Tasha and Linke Jn Paul can obtain alternative employment and are not

being compelled to do anything, the FTC argues a permanent injunction does not violate the Thirteenth Amendment.

A permanent injunction in this case is warranted. The facts in this case demonstrate, absent such a ban, Defendants, including Tasha and Linke Jn Paul, will continue to engage in deceptive telemarketing schemes, using the same tactics they carried from one company to the next. Tasha stated in her brief in opposition to the FTC's motion that she is currently working at a telemarketing company and teaching telemarketers how to speak English and phone etiquette.[6] Thus, there is an imminent possibility that such tactics are currently being utilized. Furthermore, this Court is not compelling Tasha or Linke to do anything and they may obtain any other type of employment.

Additionally, a permanent injunction is warranted based on Defendants' previous conduct in disobeying this Court's Orders. Greer continued to sell programs to the same database customers even after this Court issued a TRO. All Defendants have acted with reckless disregard for the financial interest and security of thousands of consumers. They have demonstrated their continued ability, desire, and success in committing the same deceptive acts. The danger of recurrent violations is real.

Next, the Court will consider the monetary relief requested. District courts have discretion to grant monetary equitable relief under Section 13(b) of the FTCA. *See FTC v. Magazine Solutions*, 432 F. App'x 155, 158 n.2 (3d Cir. 2011). To determine the amount of monetary relief, "[t]he Commission must show that its calculations reasonably approximated the

---

[6] Another district court has already imposed a permanent injunction against Tasha Jn Paul regarding deceptive marketing services on websites. The court permanently banned her and other defendants from: "(1) engaging in negative option marketing, continuity programs, preauthorized electronic fund transfers, or the use of testimonials, and (2) marketing and selling products related to grants, credit, business opportunities, and diet supplements or nutraceuticals." *Grant Connect, LLC*, 827 F. Supp. 2d at 1232.

amount of customers' net losses, and then the burden shifts to the defendants to show that those figures were inaccurate." *Febre*, 128 F.3d at 535.

In the instant case, the FTC requests this Court exercise its power to grant equitable monetary relief and order the Defendants pay $6,879,162.22, the full amount of loss by the consumers. Based upon the investigation by FTC Investigator Mary Jo Vantusko, the FTC determined the total amount of consumer injury by reviewing the Defendants' databases and subtracted those transactions which had been returned.

Tasha and Linke Jn Paul argue the amount of damages the FTC seeks contains "consumer redress." However, the FTC demonstrated the damages were reasonably approximate to the amount of customer's net loss, minus any amount that was already returned to the consumers. Having found the Defendants violated § 5(a) of the FTCA, the Defendants are joint and severally liable for equitable monetary relief in the amount of $6,879,162.22.

Finally, this Court will allow the FTC to monitor the Defendants' conduct and compliance, as well as require records be kept to ensure compliance. The Court reviewed the record keeping provisions of the FTC's proposed permanent injunction and finds the imposition of a compliance period of eight years from the date of this order for the Defendants to retain the listed documents is reasonable. Accordingly, the FTC's requested relief will be granted.

An appropriate Order follows.


BY THE COURT:


    /s/ Juan R. Sánchez
Juan R. Sánchez, J.